5   308
94  480

## BETHEA v. McCOLL, ET ALS.

1. Where slaves and other property were given to infants by deed, and one of the conditions of the gift was, that the donees were to keep the negroes and other property together, in the possession of their mother, for their use and benefit, until the youngest came of age—*Held*, first, that the mother was thereby created a

Bethea v. McColl, et als.

trustee, to appropriate the avails of the labor of the slaves to the maintenance of the infants, the father being insolvent: Second, that as the infants had no land to cultivate, it was proper in the mother to provide land for that purpose, and that the trust fund was not the crops made by the slaves, assisted by others which the mother procured, nor the price of the hire of such slaves, but the actual value of the labor of the slaves: Third, that to ascertain the trust fund, an account must be stated annually, charging her with the value of the labor of the slaves, and giving her credit for a reasonable sum, for her care, attention and labor in the supervision of the slaves, also for the board and clothing of the children, and for all monies expended in their education, and for medical attention during sickness. That if the balance of the account thus stated, was against her in any one year, she might carry it forward to succeeding years, when the balance might be in her favor, but could not lessen the principal of the trust fund, without first obtaining an order from the chancellor.

ERROR to the Chancery Court at Cahawba.

The bill in this case was filed by the defendants in error against the complainant and wife, for an account of certain slaves and other property, conveyed to them by the plaintiff in error, by the following deeds:

Know all men by these presents, that, I, Tristram Bethea, of the district of Marion, South-Carolina, in consideration of the friendship and intimacy, love and affection which I have and bear unto John McColl, Solomon S. P. McColl, Daniel T. McColl, Philip B. McColl, and Tristram B. McColl, minors and sons of Daniel T. McColl, and also for divers other good causes me thereunto moving, have given, granted, &c., to the above named John, &c., the following slaves and other property, viz: Tina, a negro woman slave, Edmund, a negro man, and Matilda, a negro girl; also one horse, one mare, and cart, two feather beds, two counterpanes, eight white sheets, four bed covers, two bed quilts, and four pair of blankets, to have and to hold the said negro slaves, and other property, unto the said John, &c. to the only proper use and behoof of the said John, &c., their heirs and assigns, against me the said donor, my heirs and assigns; all of which said negroes and other property, I, the said Tristram Bethea have put the said donees in possession of, by the delivery thereof. And I the said Tristram Bethea, as one of the considerations of the grant, require the said donees to keep the said negroes and other property together, in the possession of their mother, Margaret McColl, for the use and benefit of the said donees

until Tristram, the youngest, shall arrive at the age of twenty-one years.    In testimony, whereof, &c.

Tristram Bethea, (Seal.)

Upon the same day the plaintiff in error executed another deed in all respects like the preceding, and with the same condition, by which he conveyed a negro slave named Henry, to Tristram and Philip B. McColl, two of the donees previously provided for.

The bill alledges that the said property came to the possession of the mother of the complainants; that their father soon after died, and subsequently the plaintiff in error married the widow. The bill also charges various acts of mismanagement of the trust fund; that the trustee has exchanged one of the slaves for another, and taken the title in her own name; that with the proceeds of the fund she has purchased a tract of land and two negro girls, and taken the titles in her own name; that the trustee and her husband claim the property as their own, refuse to educate them, &c.; with other charges of a like nature.

The prayer of the bill is for an account, and the appointment of another trustee.   John and Philip, two of the donees, have departed this life, and the bill is filed by the remaining three, two of whom are minors.

The plaintiff in error, the husband of the former Margaret McColl, answered the bill, admitted the execution of the deeds, the design of which, he insists, was to provide for a destitute family, and to protect the property from being taken for the debts of Daniel T. McColl, who was insolvent.   He insists that the labor of the slaves was not more than sufficient to support the family; that the slaves and land were purchased by the industry and economy of the trustee, aided by him; that the children were supported and educated, &c. from the labor of the slaves.

The mother of complainants has not answered the bill; a decree *pro confesso*, was taken before the register for the failure of the defendants to answer, but was afterwards set aside.

The chancellor referred the cause to the master to state an account, which he accordingly did, finding that the eighty acres of land and the two slaves mentioned in the bill were purchased with the proceeds of the trust fund; that the trustee was indebted to the general trust fund $1916, and to Tristram McColl individually. $187 75; for which a decree was rendered. .

Many exceptions were filed to the master's report, which were

overruled, but need not be here set out, as they are explained in the opinion of the court.

The assignments of error, are,

1st. Mrs. Bethea has not answered, nor is there any decree *pro confesso* against her.

2. Administration should have been granted on the estates of John and Philip McColl, and their legal representatives, parties to the bill.

3. The trustee was not liable to an account for profits before the youngest child came of age.

4. In overruling the exceptions to the report.

5. The bill should have been dismissed.

WILLIAMS, for plaintiff in error.

N. COOK, *contra.*

ORMOND, J.—The deeds under which the complainants derive their claim, convey to them a clear legal title in the slaves, and other property included in them. The clause which requires the donees to keep the property in the possession of their mother, for the use and benefit of the donees, excludes the idea that she had any interest either in the property itself, or its avails; and has the effect ascribed to it by the chancellor, of making her a trustee for her children. The effect of the deed cannot be varied by the subsequent declarations of the grantor. If there was a mistake of the drafts-man in drawing the deed, by which it was made to indicate an intention different from that contemplated by the grantor, it could be reformed in a court of chancery. That the intention was not truly expressed in the deed, rests on the assertion of the grantor, in his answer, unsupported by proof. It is also open to the objection that he has now an interest adverse to the complainants, having married their mother. But independent of this consideration, the deed cannot be impugned except by clear and satisfactory proof that by mistake it was incorrectly drawn, and thus made to speak a language different from that intended by the grantor. No such proof being made the deed must be its own interpreter; and that, in plain and intelligible language, declares that it was made for the use and benefit of the children; the mother not being named at all, except as the depository of the property, until the youngest child becomes of age.

This being the legal effect of the deed, the argument of the counsel for the plaintiff in error, that the mother of the complainant's could not be called on to account for the proceeds of the property of the infants in her hands, for their support, cannot be maintained.

In general, a father is required to maintain his children, if of ability to do so, although they may be entitled to property in their own right. [Butler v. Butler, 3 Atkins, 59; Darley v. Darley, ib. 399.] Formerly, it appears to have been considered, that even where the fund was expressly given for the maintenance of the child, the father, if of ability, must, notwithstanding, educate and support him. · [Andrews v. Partington, 3 Bro. C. C. 60.] But that rigorous rule has since been, if not departed from, at least modified, and the court will, in general, direct the trust fund, to be employed as directed by the donor, without reference to the ability of the father. [Hoste v. Pratt, 3 Vescy, 729; Sesson v. Shaw, 9 ib. 285; Fairman v. Green, 10 ib. 45.]

All the cases, however, agree, that where the father is not of ability to maintain his child, the fund may be thus appropriated. In this case, the father was insolvent, and therefore there can be no doubt that the children must be maintained from the profits of the estate devoted by the grantor to that purpose.

The property thus set apart for the support of those five children, was four slaves, two males and two females, two horses, a cart, and some inconsiderable articles of household furniture, and it would not, under good management, seem to be more than sufficient for that purpose. But the children insist that it was, and that large profits have been made from it beyond their maintenance; and although the suit wears rather an ungracious aspect, it is their right to insist on a settlement of the trust.

What is the character of the trust? The donees are required, as one of the *considerations* of the grant, (*conditions* doubtless being meant) to keep the slaves and other property in the possession of their mother, for their use and benefit, until the youngest became twenty one years of age. The primary object then was the maintenance of the donees; to secure that result the entire property was to remain in the possession of the mother until the youngest was of age. It was obvious that the slaves could be of no value, unless employed at labor, and it seems equally clear that the donor did not contemplate that they should be hired out.

It was then the services or labor of the slaves, under the supervision of the mother, from which a fund was to be raised for the support and education of the children, and as the children had no land which the slaves could cultivate, it must have been contemplated that the mother should procure land for that purpose, and it appears that she did.   By the bounty of the donor, she was furnished with land, the assistance of other slaves, and aid in money, to enable her to cultivate it.   It is not alleged in the bill, nor does it appear from the proof that this was a donation to the children, but appears to have been designed as an aid to the mother, whose husband was insolvent, and died soon after the deed was made.

It is very clear, from this statement, that the trust fund was not the crops made by the joint labor of the four slaves, and others procured by the mother, on land to which the children had no claim, but it was the actual value of the labor of the four slaves. To convert the mother, who was acting pursuant to the trust, and entitled to the possession of the slaves, into a hirer of the slaves, would be doing her the greatest injustice.   It is notorious that the hiring of slaves for agricultural purposes, is generally ruinous to the hirer, and not unfrequently also, injurious to the owner.   By being treated as the hirer of the slaves, she would doubtless be a considerable loser, and although she cannot be a gainer by it, it is very clear that she cannot be subjected to a loss while she acts in conformity with the trust, which she appears to have done.

The master has ascertained the fact to be, that two negro girls Betsey and Charlotte, and a small tract of land were purchased by the mother with the trust fund.   He attains this conclusion from the proof of witnesses, that they were purchased with monies arising from the sale of crops made by the trustee, and that she had no other means.   The fund here considered by the master as the trust fund, was the joint product of the labor, not only of the four slaves, before mentioned, but also of others furnished by the plaintiff in error, with occasional hired slaves, with plantation tools furnished by the plaintiff in error, and also land upon which the crops were made.   As already stated, the trust fund was the actual value of the labor of the four slaves, and the state of the fund could only be ascertained by stating an account, charging the trustee with the amount of such value, deducting therefrom the expense of clothing, feeding, tax, and medical attendance, of

40

any of the slaves ; and giving her credit by a reasonable sum for her labor and attention in the supervision of the slaves, also for the board and clothing of the children, and for all monies expended in their education, also for medical attendance during sickness, and if during a long protracted illness extraordinary attention was necessary, she would have the right to make a charge for it. If the balance of the account thus stated annually, was against her, it would constitute a part of the trust fund, for which she would be responsible. If the balance was in her favor, she might carry it forward to succeeding years, when the balance might be against her, but she could not be permitted to lessen the principal of the trust fund, without first obtaining an order of the chancellor to that effect.

The ascertainment of the value of the labor of a slave, is a matter of some difficulty, as it depends upon the ability of the slave to perform labor—the quality of the soil upon which it is employed—the skill with which it is directed—and the price of its product; but we think a sufficient approach to certainty may be made in this case, by taking the opinion of well informed planters acquainted with the facts. It may be added, that this appears to be the only practicable mode which can be resorted to in this case, and we hesitate not to say that the account should be stated with liberality towards the trustee.

The general principle is undoubted, that a trustee cannot make a profit for himself by the employment of the trust fund, and if it be used in the purchase of property, the *cestui que trust* may, at his election, take the property thus purchased, unless it has come to the possession of a *bona fide* purchaser without notice of the trust. So also, if the trust fund be invested in trade, the trustee must account for the profits. [Taylor v. Plumer, 3 M. & S. 575 ; Spencer's adm'r v. Whitaker, 3 Porter, 297. See also the authorities collected by Lewin on Trusts, 201, 4 ; and 2 Story's Equity, 503, 7.]

As already stated there was no evidence before the master authorizing him to conclude that any property had been purchased with the trust funds by the trustee. As it regards the land it is shown that a considerable portion of the purchase money was advanced by the plaintiff in error.

In regard to compensation to the trustee, it may be proper to remark, that the English rule, that trusts are honorary, and the

trustee not entitled to compensation for his labor, time and trouble, has never prevailed, at least, in its full extent, in this State. It is the universal practice to allow executors and administrators a commission, as a compensation for their loss of time and trouble in executing the trust, And in the case of Spence v. Whitaker, [3 Porter, 327,] this court sanctioned the allowance of a reasonable compensation to the trustee for his time and trouble. So in Green v. Winter, [1 J. C. C. 37,] Chancellor Kent, while admitting the binding force of the English rule, as to commissions, allowed the trustee four dollars a day for his time and expences.

We can see no reason for making any distinction in the account between the period of time which elapsed before the marriage of the mother of complainants with the plaintiff in error in 1836, and the subsequent time. As by that act a control was given over the property, not contemplated by the deed, it might have been a sufficient reason for removing her from the trust, but until that was done she must be considered as trustee, with all the responsibilities and immunities which attach to her office under the deed, her husband being jointly responsible with her for her acts.

As the case must go back, it is also proper to state that it was erroneous to decree a transfer of the land which Mrs. Bethea held in her own right, as she had never answered the bill, nor was there a decree *pro confesso* in force against her. There was no necessity to take out letters of administration upon the estates of the two brothers who died during infancy. The survivors were their heirs at law, and as they had no capacity to contract debts, cannot be presumed to have any creditors.

It results from this examination that the chancellor erred in overruling the exceptions to the master's report, and his decree is therefore reversed, and the cause remanded, that an account may be stated conformable to this opinion.